IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                         Crim. No. 18-3752 KG

PEDRO PEREZ-HERNANDEZ,

    Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the Court on a bench trial held on April 9, 2019. The Indictment (Doc. 11), filed on November 14, 2018, charges Defendant Pedro Perez-Hernandez with reentry of a removed alien, in violation of 8 U.S.C. §§ 1326(a) and (b).

At the pretrial conference held on April 9, 2019, Defendant indicated that he wished to proceed with a bench trial and waive his Sixth Amendment right to a jury trial. The Court engaged in a colloquy with Defendant at the pretrial conference regarding his desire to waive his right to a jury trial. The Court found that Defendant knowingly, voluntarily, and intelligently waived his right to a jury trial. Defendant further filed a Stipulated Waiver of Right to Jury Trial. Tr. at 11-15[1]; (Doc. 51).

The case proceeded to a bench trial immediately following the pretrial conference. Following closing arguments, the Court took this case under advisement. The Court further ordered counsel to file joint and/or separate proposed findings of facts no later than May 8, 2019, which counsel did. (Docs. 53 and 56).

---

[1] "Tr." refers to the Transcript of the Pretrial Conference and Bench Trial (Doc. 55).

# FINDINGS OF FACT

Based on the admissible testimony and evidence introduced at trial, the Court makes the following Findings of Fact.[2]

## I. Defendant's Arrest

1. United States Border Patrol Agent Richard Arevalo ("Agent Arevalo") had been employed with the United States Border Patrol since 2008 and was currently assigned to Deming as part of an All-Terrain Vehicle Unit. Tr. 26:1-16.

2. On October 23, 2018, while working the afternoon shift, Agent Arevalo encountered an individual by the name of Pedro Perez-Hernandez. Tr. 26:22-27:5.

3. Agent Arevalo received information from remote video surveillance operators. The operators told Agent Arevalo that they had a visual of two individuals that had illegally jumped the United States/Mexico fence, and were walking northbound into the town of Columbus. Tr. 27:8-14.

4. When Agent Arevalo received this information, Agent Arevalo and his partner, Julio Calzada ("Agent Calzada"), were about 5 to 10 miles west of the Columbus Port of Entry. The two individuals entered the United States approximately 3 miles east of the Columbus Port of Entry. Tr. 27:15-20.

5. Due to weather conditions, other agents with forward-looking infrared cameras, or night vision cameras, responded to the area to assist. Tr. 27:20-28:1.

6. When Agent Arevalo and Agent Calzada arrived at the scene, the two individuals had separated. Agent Arevalo and Agent Calzada decided to follow the individual who went west toward the town of Columbus. Tr. 28:2-8.

---

[2] The Court accepts the testimony of the witnesses as credible.

7.     Agents lost visual of the individual because of the rain.  Consequently, Agent Arevalo and Calzada began to "sign cut" to locate the individual.  Sign cutting is "pretty much looking for footprints left by people walking out in the desert."  Tr. 28:9-15.

8.     Agent Arevalo and Agent Calzada began sign cutting in opposite directions.  After approximately 100 yards of sign cutting, Agent Arevalo ran into sign, followed it another 100 yards, and located an individual, Defendant, in the brush, trying to conceal himself.  Tr. 28:18-25.

9.     Agent Arevalo encountered Defendant near a small dirt mound with a little cluster of mesquite bush.  Defendant was tucked away inside the mesquite bush.  Tr. 31:6-8.

10.    The United States showed Agent Arevalo what had been pre-admitted as Government's Exhibit 1, a picture of Agent Arevalo's area of responsibility, which he referred to as the "port of entry" or "POE" area.  Tr. 29:1-11.

11.    The Columbus POE is located on the United States/Mexico border near the town of Columbus and near where Agent Arevalo encountered Defendant.  Agent Arevalo noted the area on Government's Exhibit 1 where he encountered Defendant with a red pin.  Tr. 29:10-30:12.

12.    Agent Arevalo found Defendant between a quarter of a mile to a half of a mile from the southeastern edge of the town of Columbus, a rural area commonly frequented by those making illegal entry into the United States.  Tr. 30:15-25.

13.    The United States showed Agent Arevalo what was pre-admitted as Government's Exhibit 2, which is a photograph of the actual mesquite bush where Agent Arevalo located Defendant.  The mesquite bush is located within the District of New Mexico, in the United States.  Tr. 31:9-20.

14. Agent Arevalo positively identified Defendant, in the courtroom, as the same person he encountered in the mesquite bush depicted in Government's Exhibit 2. Tr. 31:21-32:5.

15. Upon encountering Defendant, Agent Arevalo determined that Defendant had illegally entered the United States, placed him under arrest, and directed Defendant to a transport unit that had arrived on scene. Tr. 31:6-17.

16. Agent Arevalo did not ask Defendant at the time of arrest about his country of origin. Tr. 39:4-11.

17. After Defendant's arrest, Agent Arevalo took the photo pre-admitted as Government's Exhibit 2 on an unknown date in November 2018. Tr. 37:16-18.

## II. The Booking Process

18. United States Border Patrol Agent Derek Baker ("Agent Baker") had been employed with the United States Border Patrol for 11.5 years, and is currently assigned to the Deming Border Patrol Station. Tr. 45:19-46:12.

19. On October 24, 2018, Agent Baker was working the day shift, and participated in the processing of Defendant after his arrest. Tr. 45:13-23.

20. Agent Baker positively identified Defendant, in the courtroom, as the person he helped process on October 24, 2018. Tr. 46:24-47:4.

21. Defendant verbally claimed to be both a U.S. citizen and to have derived U.S. citizenship through his stepfather. Tr. 58:3-9.

22. Defendant insisted during the booking process that he was a U.S. Citizen and stated that he had paperwork. Tr. 58:13-23.

23. Agent Baker took Defendant's biographical information, including Defendant's name, date of birth, and fingerprints during processing. Tr. 47:9-16.

24. Agent Baker was present when Defendant's fingerprints were taken, and Agent Baker explained the process of how the fingerprints were taken in tandem with gathering Defendant's biographical information. Defendant's biographical information was verified prior to taking his fingerprints. Tr. 49:4-21.

25. The Court admitted Government's Exhibit 3, an FD-249 booking sheet containing Defendant's fingerprints. The Court noted defense counsel's objection to that Exhibit. Tr. 49:22-50:22.

26. Defendant's fingerprints were run through databases for criminal history, warrants, and immigration history, including for information on when Defendant had previously been apprehended and removed. Tr. 51:25-52:8.

27. Agent Baker determined Defendant was a citizen of Mexico, and that Defendant had been previously deported from the United States on two occasions: July 31, 2015, and September 16, 2017. Tr. 52:9-53:10.

28. When Agent Baker ran Defendant through databases, he discovered that Defendant had been convicted of illegal reentry. Tr. 62:24-63:6.

**III. Defendant's September 16, 2017, Deportation**

29. Juan Carlo Abad ("Agent Abad") is currently employed by Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and has been so employed for approximately 18 months. Prior to that time, Agent Abad worked for ICE Enforcement and Removal Operations ("ICE-ERO") for seven years as a deportation officer. Tr. 65:16-66:5.

30. On September 16, 2017, Agent Abad was working as an ICE-ERO deportation officer in Bakersfield, California. On that date, Agent Abad drove a group of 18 individuals from

Bakersfield, California, to San Ysidro, California, to deport them from the United States to Mexico. Tr. 66:21-67:3.

32. Agent Abad personally remembered that deportation run, because it was the only time he had to drive a group of people from Bakersfield, California, to San Ysidro, California, to be deported. Defendant was one of the aliens in that group. Tr. 67:4-67:11.

32. The United States showed Agent Abad what had been pre-admitted as Government's Exhibit 5. Exhibit 5 is a photograph of the door in the border fence through which Agent Abad physically deported aliens to Mexico from San Ysidro. The door in the fence actually had two doors, one on the Mexican side, and one on the United States' side. Once aliens passed through the door from the United States' side, the aliens were in Mexico. Agent Abad personally observed every alien he transported that day walk through that door and be deported to Mexico, including Defendant. Tr. 67:15-69:13.

33. The United States showed Agent Abad what had been pre-admitted as Government's Exhibit 9. Exhibit 9 is an I-205 form, which is a deportation order. Exhibit 9 bears Defendant's name, Pedro Perez- Hernandez and alien number,035-303-94; and reflects that Defendant was deported on foot through San Ysidro, California, on September 16, 2017. Tr. 69:14-71:8.

34. The writing on Government's Exhibit 9 belongs to Agent Abad, who personally memorialized on the I-205 form that Defendant was deported through San Ysidro, California, on foot. The I-205 form bears Agent Abad's signature in the "departure witnessed by" column, along with his badge number. Agent Abad signed the "departure witnessed by" column because he actually witnessed Defendant crossing the border into Mexico. Tr. 70:21-71:23.

**IV.     Fingerprint Evidence**

35.     Before retiring, Edward John Sanchez ("Mr. Sanchez") worked at (1) the El Paso Police Department as a senior latent fingerprint examiner from November 2017 to May 2018; (2) the New Mexico Department of Public Safety at the Southern Forensic Laboratory from 2007 to 2013; and (3) the Las Cruces Police Department ("LCPD") as an identification technician from 1986 to 2007.  Tr. 80:20-81:24.

36.     As an identification technician with LCPD, Mr. Sanchez worked as a fingerprint examiner and as a crime scene technician.  While at the Southern New Mexico Crime Lab, Mr. Sanchez worked as a forensic scientist in the field of latent fingerprints.  Tr. 82:2-8.

37.     Mr. Sanchez completed numerous courses given by the FBI in fingerprint classification as well as fingerprint comparison.  He also completed Identification Training Seminars in demystifying fingerprints, advanced ridgeology, and comparison techniques.  Further, Mr. Sanchez attended numerous conferences and seminars pertaining to the field of fingerprints.  Tr. 84:7-13.

38.     Mr. Sanchez is a member of the International Association for Identification.  He has taught in the field of fingerprint analysis and identification.  Specifically, he has taught classes at the Las Cruces Police Academy and the New Mexico Law Enforcement Academy in Santa Fe, New Mexico.  Tr. 84:14-25.

39.     Mr. Sanchez has testified as an expert in fingerprints in both state and federal court, including in state courts in Dona Ana County, Luna County, Sierra County, Bernalillo County, Otero County, and Lea County.  Further, Mr. Sanchez has testified as an expert in United States District Court in Las Cruces, Albuquerque, and Santa Fe.  Tr. 85:5-11.

40. Mr. Sanchez has testified as an expert between 50 and 100 times. Tr. 85:12-16.

41. Mr. Sanchez is an expert in the field of fingerprint analysis and identification.[3] Tr. 87:16-19.

42. When a fingerprint examiner compares fingerprints, the examiner may only reach one of three conclusions: (1) the prints were made by one and the same individual; (2) the prints were not made by one and the same individual; or (3) there is insufficient clarity or detail in one or more of the impressions to arrive at any conclusion. Tr. 88:15-15.

43. "Known prints" are prints taken from a known individual. Known prints are used by comparing their ridge characteristic formations to the other prints that are being used to determine if the individual in both sets of prints is the same individual or not. Tr. 89:8-11.

44. Mr. Sanchez reviewed numerous fingerprints in this case, including Government's Exhibit 4.[4] Mr. Sanchez marked his initials and the date of examination on the pages of Exhibit 4 when he originally examined them. Tr. 89:12-90:5.

45. Government's Exhibit 4 contains Exhibits labeled FP1, FP2, FP3, FP4, FP5, FP6, and FP7, and each Exhibit is a separate fingerprint exemplar. The Exhibits appeared to be in the same condition as they were when Mr. Sanchez reviewed them, and they did not appear to be changed. Tr. 90:9-91:10.

46. Exhibit FP1 is Defendant's known print. Mr. Sanchez compared the known print in FP1 to the fingerprints contained in FP2 through FP7. After his examination and comparison, Mr.

---

[3] The United States moved to have Mr. Sanchez recognized under Federal Rule of Evidence 702 as an expert in the field of fingerprint analysis and identification. Defense counsel requested *voir dire* of Mr. Sanchez before the Court's ruling on the United States' oral motion. Tr. 85:24-86:9.

[4] The Court allowed defense counsel to *voir dire* Mr. Sanchez regarding Government's Exhibit 4 prior to its admission. Tr. 91:20-94:1. The Court then admitted Government's Exhibit 4. Tr. 94:16-17.

Sanchez concluded that the fingerprints contained in Exhibits FP1 through FP7 were all made by one and the same individual. Tr. 95:9-11.

47. Mr. Sanchez performed his fingerprint analysis and comparison using original documents from Defendant's A-file at the U.S. Attorney's Office. When fingerprints are copied, they sometimes lose some of their quality. Consequently, some of the fingerprints being reviewed in Court might be of slightly lower quality than the originals Mr. Sanchez reviewed. Tr. 102:9-25.

48. Mr. Sanchez analyzed the originals of FP1 through FP7. Tr. 103:1-7.

**V. Defendant's Citizenship**

49. Margaret Hartnett ("Director Hartnett") is the Field Office Director ("FOD") for the El Paso Field Office for United States Citizenship and Immigration Services ("USCIS"). She has been working for USCIS and its predecessor, Immigration and Naturalization Services, since 2002. Tr. 110:9-15.

50. Director Hartnett's office adjudicates all applications for immigration benefits, whether that means an application for legal permanent residency, citizenship, or naturalization. Tr. 110:24-111:8.

51. Prior to becoming FOD, Director Hartnett was an adjudications officer, previously known as an examiner. Adjudication officers review, interview, and adjudicate immigration applications and petitions. Director Hartnett held that position until the title was changed to immigration services officer. Director Hartnett held that post until she became a supervisor of immigration service officers. After that, she was promoted to FOD. Tr. 111:12-22.

52. As part of her job as an adjudications officer, Director Hartnett reviewed thousands of alien files, known as "A-files," per year. She did this for at least the first eight years of her career. Tr. 112:1-9.

53. USCIS maintains hard copies of A-files and maintains centralized computer databases to hold digitized information from A-files. Those centralized computer databases include the Central Index System ("CIS"), the Enforce Alien Removal Module ("EARM"), and the Person Centric Query System ("PCQS"). Tr. 112:13-20.

54. In each of these databases, one person is distinguished from another by their "A-number," which also becomes their A-file number. Anyone coming to the United States as an immigrant gets an A-number and an A-file. Tr. 112:21-113:9.

55. In response to a request, USCIS researched whether Pedro Perez-Hernandez had applied for permission to reapply for admission to the United States after his deportation. Specifically, USCIS was asked to search its databases to ascertain if Defendant had ever filed an I-212 form, the form used to seek permission to apply to reenter the United States. Tr. 114:1-4.

56. When a person has been removed or deported from the United States, that person should apply for permission to reapply for admission to the United States via an I-212 form application. I-212 forms are submitted to USCIS. Tr. 114:8-14.

57. Director Hartnett personally reviewed all three parts of the A-file belonging to Defendant and saw no I-212 form in the A-file. Tr. 116:9-10, 116:19-117:3.

58. Director Hartnett also personally reviewed USCIS databases, including EARM, PCQS, and CIS, and saw that there was no I-212 form for Defendant in any of those systems. Tr. 116:10-18.

59. USCIS is the custodian of Defendant's A-file; the records kept in the A-file are kept in the regular course of business for USCIS; the creation of the records contained in the A-file are part of the regular course of business for USCIS; and the records are made at or near the time they are created by someone with knowledge of the records' contents. Tr. 118:3-15.

60.     USCIS also collects records in the A-file from other agencies; the records USCIS aggregates from other agencies are kept in their normal course of business and then transmitted to USCIS for placement in the A-file; the creation of those records are part of the regular course of business for the other agencies that transmit documents to USCIS; and the records transmitted to USCIS for placement in the A-file by other agencies are made at or near the time they were created by someone with knowledge of their contents. Tr. 118:16-119:8.

61.     Aliens can obtain United States citizenship through naturalization, or they can file an N-600 application to derive or acquire citizenship. Tr. 150:16-25.

62.     Even individuals born overseas to United States parents need to file an N-600 application to have proof of their citizenship. Tr. 154:19-20.

63.     Defendant's A-file does not contain an N-600 application filed with USCIS. Tr. 155:15-24.

64.     Defendant's mother was born in Mexico. Tr. 156:2.

65.     Defendant's natural father was born in Mexico. Tr. 156:4.

66.     Defendant was born in Mexico. Tr. 165:10-11, 16-18; Government's Exhibit 7 (birth certificate).

67.     Consuelo H. Weiss received Social Security benefits for a child, Pedro Perez. Def.'s Ex. D.[5]

68.     "Pedro Perez" is the same person as Defendant Pedro Perez-Hernandez. Def.'s Exs. D, E and F.

---

[5] The Court heard argument from the parties and ultimately admitted Defendant's Exhibits D, E, and F, thereby overruling the Unites States' argument that Defendant's Exhibits D, E, and F were irrelevant. Tr. 134:2-150:6.

69.     Herbert Seymour Weiss applied for an I-130 child visa for his step-son, Pedro Perez Hernandez on or about July 7, 1975, noting the child's date of birth was June 29, 1958.  Def.'s Ex. E; Government's Exhibits 3 and 13.

70.     Herbert Seymour Weiss is reflected in the I-30 child visa application as the Petitioner and Pedro Perez Hernandez is reflected as the Beneficiary.  Box 4 on the I-130 form reflects that the Beneficiary is related to the Petitioner as "step-son."  Box 6 on the I-130 form reflects that the relationship between Petitioner and Beneficiary is through adoption.  Def.'s Ex. E.

### VI.    Defendant's A-File

71.     Border Patrol Agent Luis Diaz ("Agent Diaz") has been a Border Patrol Agent since 2007 and is currently assigned to the Deming Prosecutions Unit.   Agent Diaz is the case agent assigned to Defendant's case.  Tr. 160:22-162:18.

72.     Agent Diaz received some degree of training on determining a person's citizenship in the U.S. Border Patrol Academy.   As a prosecutions agent, Agent Diaz routinely reviews A-files and has become familiar with the forms included in an A-file, including I-205s and orders of deportation. Tr. 161:10-15, 162:7-15.

73.     Agent Diaz reviewed Defendant's A-file in its entirety.  Tr. 162:19-23.

74.     The United States showed Agent Diaz what was pre-admitted as Government's Exhibit 8. Exhibit 8 is an order of an immigration judge, bearing Defendant's name and A-number.  The order bears a date of March 4, 2015, and beneath the date, where the order bears an "X," indicates that an immigration judge ordered Defendant removed.  Tr. 166:20-167:18.

75.     On Government's Exhibit 8, next to the space marked "other," the order states "USC claim overruled." Tr. 167:24-168:1.

76. After the immigration judge issued the order, Defendant was deported. Tr. 168:5.

77. The United States showed Agent Diaz what had been pre-admitted as Government's Exhibit 11. Exhibit 11 is an I-205 warrant of removal/deportation from Defendant's A-file which bears Defendant's name, Defendant's A-number, and a July 31, 2015, date. Tr. 168:16-19, 170:9-15.

78. The I-205 warrant of removal/deportation, at page 3, warns Defendant not to return to the United States:

> In accordance with the provisions of section 212(a)(9) of the Immigration and Nationality Act, you are prohibited from entering, attempting to enter, or being in the United States … [a]t any time, because you have been found inadmissible or excludable under the Section 212 of the Act or deportable under Section 241 or 237 of the Act and ordered deported or removed from the United States and you have been convicted of a crime designated as an aggravated felony.

Tr. 172:8-11, 20-25.

79. Following Defendant's deportation on July 31, 2015, Border Patrol apprehended Defendant on August 3, 2015. Tr. 173:1-4.

80. Following Defendant's apprehension on August 3, 2015, Defendant was convicted on May 8, 2016, in United States District Court, of violating 8 U.S.C. § 1326, illegal reentry. Tr. 173:6-7.

81. Government's Exhibit 9 is an August 14, 2017, I-205 warrant of removal/deportation, bearing Defendant's name, A-number, photograph, thumbprint, and signature. Tr. 173:8-21.

82. Government's Exhibit 13 is a voter registration card from Mexico, issued to Defendant in 2018. Tr. 175:13-176:2.

83. The EARM online database shows that Defendant has been removed to Mexico on a number of occasions, and also had "quite a few voluntary removals to Mexico." When aliens are removed to a country, it is typically to their country of citizenship. Tr. 180:4-8.

84. Defendant's A-file does not contain an I-212 application that would allow Defendant to reapply for permission to enter the United States. Tr. 180:9-14.

## CONCLUSIONS OF LAW

1. A conviction under 8 U.S.C. §§ 1326(a) and (b) requires that the United States prove each of the following elements beyond a reasonable doubt:

> First: the Defendant was an alien at the time alleged in the Indictment;
>
> Second: the Defendant had previously been deported from the United States;
>
> Third: the Defendant was found in the United States having entered knowingly; and
>
> Fourth: the Defendant had not received the consent of the proper legal authority to reapply for admission to the United States.

Tenth Cir. Crim. Pattern Jury Instruction 2.5 (updated Feb. 2018) (modified). "An alien is a person who is not a citizen or national of the United States." *Id.*

2. The United States' burden to prove alienage beyond a reasonable doubt does not require that the United States prove Defendant's lack of derivative citizenship. *United States v. Urquidi-Alvarado*, 2007 WL 9729149, at *6 (D.N.M.) (observing that "[w]hile it is the Government's burden to prove alienage beyond a reasonable doubt, the Government need not prove the Defendant's lack of derivative citizenship") (citing *United States v. Hodulik*, 44 Fed. Appx. 656, 660 (6th Cir. 2002); *United States v. Garcia-Mancha, Jr.*, 2001 WL 282769, *8-9 (N.D. Tex.)). A defendant, however, may "rebut the [United States'] assertion of his alien status … by raising the defense of derivative citizenship." *Id.* "It is the [d]efendant's burden to prove that he is entitled to the defense of derivative citizenship." *Id.*

3. A defendant's good-faith belief that he was entitled to enter the United States is not a defense to a Section 1326 charge. *United States v. Miranda-Enriquez*, 842 F.2d 1211, 1213

(10th Cir. 1988) (holding that defendant's "mistaken, belief that he was lawfully present in the United States" is not appropriate defense to Section 1326 charge).

4. In this case, Defendant was born in Mexico to Mexican parents. Defendant's step-father, Herbert Seymour Weiss, was apparently a United States citizen and was married to Defendant's mother, Consuelo. Defendant has not demonstrated how receiving Social Security child benefits or applying for a child visa on behalf of Defendant proves that Defendant is a United States citizen. Also, that the I-130 form Mr. Weiss completed indicates a relationship by adoption does not establish that Mr. Weiss, in fact, adopted Defendant. Defendant did not offer legal adoption documents nor did the Court admit any such documents. Moreover, Defendant has not filed an N-600 form to derive or acquire United States citizenship.[6] The Court concludes that Defendant has not carried his burden with admissible evidence to establish a derivative citizenship defense. On the other hand, the United States has proven beyond a reasonable doubt that Defendant "is not a citizen or national of the United States" and, therefore, Defendant was an alien on October 23, 2018, the time alleged in the Indictment. *See* Tenth Cir. Crim. Pattern Jury Instruction 2.5.

5. On July 31, 2015, Defendant was deported from the United States to Mexico pursuant to an I-205 Warrant of Removal/Deportation. On September 16, 2017, Defendant was again deported from the United States to Mexico pursuant to an I-205 Warrant of

---

[6] Even if Defendant had filed an N-600 form and Mr. Weiss legally adopted Defendant, Defendant would not be eligible for citizenship under the 2001 Child Citizenship Act. *See Dave v. Ashcroft*, 363 F.3d 649, 654 (7th Cir. 2004) (noting that Child Citizenship Act of 2000 "grants automatic citizenship to children born outside of the United States who have at least one U.S. citizen parent" if child was not over age 18 on February 7, 2001, effective date of Act). According to the I-130 form filled out by Mr. Weiss, Defendant was born on June 29, 1958, making Defendant well over 18 years old on February 7, 2001. *See also* Government's Exhibits 3 and 13.

Removal/Deportation. Consequently, the United States has proven beyond a reasonable doubt that Defendant had been deported prior to October 23, 2018.

6. Defendant has previously entered the United States numerous times and been removed numerous times, sometimes voluntarily. Indeed, the July 31, 2015, Warrant of Removal/Deportation warned Defendant that he was "prohibited from entering, attempting to enter, or being in the United States … [a]t any time…." Government's Exhibit 11 at 3. Nonetheless, on October 23, 2018, Defendant illegally crossed over the United States/Mexico border fence instead of entering the United States through the Columbus POE located three miles away. Defendant then walked in the rain and in the desert toward the town of Columbus, New Mexico. Defendant subsequently tried to conceal himself from Border Patrol Agents by hiding inside a mesquite bush. Agent Arevalo encountered Defendant inside the mesquite bush. From these facts, the Court concludes that the United States proved beyond a reasonable doubt that "Defendant was found in the United States having entered knowingly." *See* Tenth Cir. Crim. Pattern Jury Instruction 2.5.

7. Although Defendant is not a United States citizen and was "prohibited from entering, attempting to enter, or being in the United States … [a]t any time," Defendant has not filed an I-212 form to seek permission to apply to reenter the United States. *See* Government's Exhibit 11 at 3. The United States has proved beyond a reasonable doubt that "Defendant had not received the consent of the proper legal authority to reapply for admission to the United States." *See* Tenth Cir. Crim. Pattern Jury Instruction 2.5.

8. In sum, the Court finds and concludes that the United States has proven beyond a reasonable doubt that Defendant violated 8 U.S.C. §§ 1326(a) and (b), reentry of a removed alien.

IT IS ORDERED that Defendant Pedro Perez-Hernandez is **GUILTY** of the crime charged in the Indictment.

_____
UNITED STATES DISTRICT JUDGE